IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **ARCHER DANIELS MIDLAND COMPANY,** : |
| : |
| **Plaintiff,** : |
| : **CASE NO.** |
| **v.** : |
| : |
| **SHERMCO INDUSTRIES, INC.,** : |
| : |
| **Defendant.** | |

## COMPLAINT

Archer Daniels Midland Company ("ADM") hereby brings this Complaint against Shermco Industries, Inc. ("Shermco"). In support, ADM alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1. ADM is a Delaware corporation with its principal place of business in Decatur, Illinois.

2. On information and belief, Shermco is a Texas corporation that maintains its principal place of business in Irving, Texas.

3. This Court has original jurisdictional of this civil action pursuant to 28 U.S.C. § 1332, as the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiff and Defendant.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district and/or a substantial part of the property that is the subject of this action is situated in this district.

5. This Court has personal jurisdiction over Defendant because it has sufficient contacts within Nebraska as would make Defendant reasonably aware of its potential to be

1

hauled into a court within this state. To wit, Defendant entered into agreements with Plaintiff whereby Defendant would provide certain services to be physically performed at a facility located in Nebraska, and Defendant sent its employees to that Nebraska facility to perform the agreed upon work.

## COMMON FACTUAL ALLEGATIONS

6. ADM owns and operates a corn processing/ethanol plant in Columbus, Nebraska (the "Plant"), which processes raw corn and converts it into a variety of feed, food and ethanol products.

7. Shermco is a provider of testing, maintenance, repair, commissioning, engineering, and training services for electrical infrastructure, including substations, switchgear, transformers, motors, and generators.

8. The Plant is a cogeneration plant that utilizes a combined heat and power system as part of its operations.

9. That heat and power system relies on two coal-fired boilers (the "Boilers") that produce high pressure steam at approximately 1,250 psi. This high pressure steam, in turn, is used to operate one turbine driven electrical generator that produces, under normal circumstances, 50-55 megawatts. This power is consumed by the Plant for its operations.

10. Once the high pressure steam is fed through and exits the turbine, its pressure falls to approximately 170 psi, and is fed into the Plant's mechanical systems. These systems operate the Plant, and include systems that provide heat for the ethanol distillation process. Loss of this steam pressure would effectively shut down Plant operations, at least until such time as the source of low pressure steam can be restored.

11. On or about October 29, 2012, ADM and Shermco entered into a *Contractor's Agreement* that applied to all "work currently being performed by [Shermco] for ADM and all

work performed under existing and future work orders, purchase orders, and contracts entered into between the parties…" (hereafter the "Contractor's Agreement"); a true and correct copy of the Contractor's Agreement is attached hereto as Exhibit A. *See* Exh. A, ¶1.

    12.    Among other things, the Contractor's Agreement provides that:

        a.    "it is mutually understood and agreed that, in performing any work or services under this Agreement, [Shermco] shall act as an independent contractor and not as a subcontractor, agent, or employee of ADM; and [Shermco] shall have and maintain control, direction and responsibility over its own employees and subcontractors and over the work, including the work of its subcontractors." *See* Exh. A, Art. II;

        b.    "[Shermco] shall be in charge and control of the work-site, which is limited to that area where [Shermco] or its subcontractors are performing work for ADM." *See* Exh. A, Art. III;

        c.    "[Shermco] shall take all measures necessary to prevent damage or destruction of ADM's property, manufacturing processes and products by the performance of the work and shall be liable for to ADM for damages causes by its failure to do so." *See* Exh. A, Art. V, Subsection C;

        d.    "[Shermco] shall obtain approval from ADM's authorized representative before performing work on any equipment or machinery provided by ADM." *See* Exh. A, Art. VIII, Subsection A;

        e.    Shermco will obtain and maintain, among other policies, a comprehensive commercial general liability insurance policy "which is primary to ADM for bodily injury . . . and/or property damage" that also includes an additional endorsement and/or coverage "insuring the obligations of [Shermco] under [the Agreement] and any and all contracts in effect." *See* Exh. A, Art. X, Subsection A(2);

        f.    "[Shermco] agrees to indemnify, defend and hold ADM harmless from any and all claims, suits, causes of action, liabilities, damages, judgments or expenses . . . for personal injuries . . . or property damage to [ADM] arising out of [Shermco's] or its subcontractors work for ADM or the performance of [Shermco's] obligations under [the Agreement] or any other contract with ADM, to the extent said injuries are caused by the . . . negligence,

    fault and/or violation of applicable law by [Shermco]." *See* Exh. A, Art. XI;

 g. "[Shermco] agrees to assume all liability for its negligence and the negligence of its employees and subcontractors and agrees that the negligence of [Shermco] or its subcontractors shall be imputed to [Shermco]." *See* Exh. A, Art. XI;

 h. "It is contemplated that the parties shall enter into contracts, work orders or purchase orders for performance of specific assignments, and this . . . Agreement shall be incorporated into those contracts, work orders or purchase orders as additional terms." *See* Exh. A, Art. XXV.

## I. The First Incident

13. ADM retained Shermco to conduct transformer, breaker, and relay testing at the Plant, to be performed in October 2016.

14. Shermco began its electrical work on October 24, 2016. Several employees of Shermco performed this work at the Plant, including Joel Bonds, the employee of Defendant who was responsible for completing the relay testing.

15. Beginning on October 24, 2016, 11 electrical relays at the Plant were tested with no disruptions to the Plant's operations.

16. All 11 of these electrical relays are associated with the main electrical breakers at the Plant; each relay tested is critical to the Plant's power supply and has the capability of interrupting power to the Plant and Boilers. The relays can require several hours of testing to complete successfully the required analysis.

17. At some point in the late afternoon of October 27, 2016, Shermco had completed all scheduled work except for five electrical relays that still needed testing.

18. These five remaining relays were in two separate locations at the Plant. One is the generator protection panel on top of the generation building and the other four of the untested relays are located on a lower level in an area referred to as the "Switchgear Room."

4

19. A representative of ADM met with Shermco's onsite foreman and Mr. Bonds late in the day on October 27, 2016 to discuss the plan for testing the remaining relays.

20. These individuals mutually decided that Mr. Bonds would be permitted to finish testing the generator protection panel and test <u>one</u> more relay in the Switchgear Room, if time allowed. It was agreed that all other work was to continue the following day.

21. ADM did not require, nor did ADM agree that, all work by Shermco was to be completed by October 27, 2016.

22. At approximately 6:00 p.m. on October 27, 2016, Mr. Bonds had finished testing the generator protection relay and one of the four relays located in the Switchgear Room as was earlier agreed upon. At that time, all of Shermco's employees, other than Mr. Bonds, left the Plant.

23. Mr. Bonds then began to perform an additional relay test in the Switchgear Room.

24. As part of the standard practice performed by any skilled electrical worker in testing relays in this situation, the individual would open any trip test switches first prior to pulling the voltage and current test switches; this would protect the system from nuisance trips that could cause the Plant to lose power during testing.

25. Upon information and belief, Mr. Bonds, contrary to standard practice, walked from one end of the Switchgear Room to the other and pulled the voltage/current switches before pulling the trip switches.

26. More specifically, as the diagrams attached hereto as Exhibit B illustrate: (i) the test switches at tie breaker 1199 were improperly opened; (ii) the relay associated with compartment 1199 tripped the main breaker 1100 because it lost the voltage signal wired through the test switches that were opened improperly; (iii) both ties breakers (in green) were opened and

racked out from testing earlier in the day; (iv) the voltage/current switches were opened before the trip switches were opened; and (v) the relay lost its the voltage signal but still had contact with its trip switches.

27. Pulling those switches in the incorrect order as Mr. Bonds did created a loss of electrical input to the relay, which in turn caused one of the main breakers at the Plant to trip. This then caused a loss of power to the Plant's Boilers, thereby shutting down all of the Plant's production processes.

28. Contemporaneously with the disruption of power at the Plant, Mr. Bonds prepared a handwritten admission of what occurred, stating: "while testing the tie breaker relays, I pulled the voltage / current test switches prior to pulling the trip/output contacts. This caused the relay to see an undervoltage condition and send a trip signal to the 1100 bus breakers." A true and correct copy of this admission is attached hereto as Exhibit C.

29. As a result of Shermco's errors and the resultant loss of power and disruption to Plant processes, ADM sustained loss of production, cover, and subsequent start-up damages totaling at least $733,486.00.

30. ADM issued a demand to Shermco for payment and reimbursement of ADM's losses related to this incident pursuant to the Contractor's Agreement, but Shermco has thus far refused to reimburse ADM its costs and make ADM whole in this matter.

**II.    The Second Incident**

31. ADM also engaged Shermco's services in testing electrical transformers at the Plant in November 2016.

32. On November 5, 2016, an ADM employee discovered that a generator at the Plant would not come on-line, which delayed the start-up of the Plant's normal processes.

33. The generator's failure to come on-line and the resulting delay in normal Plant processes were the result of Shermco's prior and undisclosed errors during the testing process performed earlier.

34. Under normal circumstances, the completion of generator testing requires the tester to "demagnetize" the generator's transformer core before it can be brought back online. Shermco's employees failed to demagnetize the transformer core, which resulted in the generator's failure.

35. Shermco further failed to inform or notify ADM of the impending problems with the generator. As a result, ADM was unable to bring the generator on-line until ADM employees: (i) discovered the problem; and (ii) were able to diagnose and correct the errors caused by Shermco.

36. As a result of Shermco's errors during the generator testing process, ADM incurred losses of at least $30,870.00.

37. ADM issued a demand to Shermco for payment and reimbursement of ADM's losses related to this incident pursuant to the Contractor's Agreement, but Shermco has thus far refused to reimburse ADM its costs and make ADM whole in this matter.

## COUNT I: BREACH OF CONTRACT

38. Plaintiff hereby incorporates paragraphs 1 through 37 as though fully set forth herein.

39. Shermco and ADM entered into and are parties to the Contractor's Agreement.

40. The Contractor's Agreement provides that "[Shermco] shall take all measures necessary to prevent damage or destruction of ADM's property, manufacturing processes and products by the performance of the work and shall be liable to ADM for damages caused by its failure to do so." *See* Exh. A, Art. V, Subsection C.

41. The Contractor's Agreement also provides that "[Shermco] agrees to indemnify, defend and hold ADM harmless from any and all claims, suits, causes of action, liabilities, damages, judgments or expenses . . . for personal injuries . . . or property damage to [ADM] arising out of [Shermco's] or its subcontractors work for ADM or the performance of [Shermco's] obligations under [the Contractor's Agreement] or any other contract with ADM, to the extent said injuries are caused by the . . . negligence, fault and/or violation of applicable law by [Shermco]." *See* Exh. A, Art. XI.

42. The Contractor's Agreement further provides that "[Shermco] agrees to assume all liability for its negligence and the negligence of its employees and subcontractors and agrees that the negligence of [Shermco] or its subcontractors shall be imputed to [Shermco]." *See* Exh. A, Art. XI.

43. All conditions precedent to the enforcement of the Contractor's Agreement have been met and ADM is not in breach of the Contractor's Agreement.

44. Shermco's actions and failures to reimburse ADM for the harm ADM suffered as a consequence of Shermco's actions are material breaches of the Contractor's Agreement as detailed more fully under the First Incident and Second Incident factual allegations *infra*.

45. As a direct result of Shermco's material breaches of the Contractor's Agreement, ADM sustained damages, including but not limited to loss of production, cover, and start-up costs totaling at least $733,486.00, as associated with the First Incident.

46. As a direct result of Shermco's material breaches of the Contractor's Agreement, ADM sustained damages, including but not limited to losses of at least $30,870.00, as associated with the Second Incident.

## COUNT II: NEGLIGENCE

47. Plaintiff hereby incorporates paragraphs 1 through 46 as though fully set forth herein.

48. Shermco's employee, Mr. Bonds, was performing skilled labor in the form of electrical work at the Plant, which is an industrial facility containing sophisticated electrical operations.

49. Mr. Bonds, in performing that work, owed a duty to ADM to perform the electrical work with the same diligence, skill, and care as ordinarily employed by those persons in the industrial-electrical business in the community and area in which he was engaged in such business.

50. A reasonable electrician working in an industrial facility and employing diligence, skill, and care as ordinarily used in such a setting would have known that the trip switches must be opened prior to pulling voltage current switches when testing relays at the Plant. Mr. Bonds, however, did the exact opposite.

51. Mr. Bonds' actions were therefore unreasonable and a breach of the duty owed to ADM.

52. As a direct and proximate result of Mr. Bonds' breaching actions, ADM suffered harm. This harm caused ADM to sustain damages.

53. Mr. Bonds' actions in breaching the duty owed to ADM and thereby harming ADM were within the course and scope of Mr. Bonds' employment with Shermco. As such, Mr. Bonds' liability for those damages is imputed to Shermco under the Nebraska doctrine of respondeat superior. *Kocsis v. Harrison*, 249 Neb. 274, 280 (1996).

54. Furthermore, accompanying every contract is a common-law duty to perform the obligations of that agreement with care, skill, reasonable expediency, and faithfulness. *Lincoln*

9

*Grain, Inc. v. Coopers & Lybrand*, 216 Neb. 433, 437 (1984). A breach of that duty to perform creates causes of action arising in both contract and tort. *Id.*

55. Shermco had a duty to ADM to, among other things, take all measures necessary to prevent damage to or destruction of ADM's property, its manufacturing processes and products, and to perform its work for ADM with care, skill, reasonable expediency, and faithfulness.

56. Shermco failed to perform the work associated with the First Incident with care, skill, reasonable expediency, and faithfulness; such a failure to perform was a breach of Shermco's duty to ADM.

57. Shermco's failures to perform the work associated with the First Incident in a careful, skillful manner with reasonable expediency and faithfulness directly and proximately caused ADM to be harmed.

58. As a result of that harm, ADM sustained damages.

59. Shermco also failed to perform the work associated with the Second Incident with care, skill, reasonable expediency, and faithfulness; such a failure to perform was a breach of Shermco's duty to ADM.

60. Shermco's failures to perform the work associated with the Second Incident in a careful, skillful manner with reasonable expediency and faithfulness directly and proximately caused ADM to be harmed.

61. As a result of that harm, ADM sustained damages.

62. Therefore, as a result of Shermco's negligence, ADM sustained damages, including but not limited to loss of production, cover, and start-up costs totaling at least

$733,486.00 related to the First Incident, and losses of at least $30,870.00 related to the Second Incident.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Archer Daniels Midland Company respectfully requests that this Court enter judgment against Defendant Shermco Industries, Inc. in an amount to be determined at trial of at least $764,338.00, plus interest, costs and expenses, attorneys' fees, and any further relief this Court deems proper and just.

## JURY DEMAND

ADM demands a jury trial as to all triable issues in this action and requests that trial be held in Omaha, Nebraska.

Respectfully submitted,

STINSON LEONARD STREET LLP

By: /s/ Patrick R. Turner
Patrick R. Turner                #23461
1299 Farnam Street, Suite 1500
Omaha, NE 68102-1818
Phone: 402.342.1700
Fax: 402.930.1701
patrick.turner@stinson.com

Robin K. Carlson                 #25888
1201 Walnut, Suite 2900
Kansas City, MO 64106
Phone: 816.691/2377
Fax: 816.412.1058
robin.carlson@stinson.com

ATTORNEYS FOR ARCHER DANIELS MIDLAND COMPANY

11